Good morning. May it please the court. My name is David Hanson, Knox County Assistant State's Attorney, and I'm here together with Mr. John Pettmeier, Knox County State's Attorney, representing the appellant county of Knox. We're requesting that the judgment of the trial court deny the county's petition for a permanent injunction be reversed and remanded with instructions to issue that permanent injunction. In its petition, the county sought to permanently enjoin the appellee, Terry Bell, from continuing to operate a junkyard on his property in violation of the county's zoning ordinance. Mr. Bell admitted, stipulated to the fact that he is operating and maintaining a junkyard on the property as that term is defined in the Knox County zoning ordinance. And he also admitted that his property is zoned B2 and that a junkyard is not a permitted use in the B2 district. Based on those admissions, the only issue before the trial court was the affirmative matter of whether Mr. Bell's junkyard operation constituted a legal, non-conforming use. That is, whether Mr. Bell could show by preponderance of the evidence that a junkyard operation like the one he has been and continues to operate on the property has continually existed on that property since prior to enactment of the 1967 Knox County zoning ordinance. And let me just ask you, so does that then involve a question of fact? Well, the issue of whether or not the use in 1967 is an identical use or the same use as what's currently on the property is an issue of fact, yes. However, of course, the interpretation and application of the definition of junkyard as found in the zoning ordinance would be reviewed de novo and no deference needs to be given to the trial court. And then in applying the facts to that particular definition of the term junkyard, I believe the clearly erroneous standard would be appropriate there. But as far as whether or not the uses are identical, that would be a manifest weight of the evidence, I believe. We submit that a careful review of the record shows that it is devoid of any evidence to support a finding that a junkyard, as defined by the ordinance, existed on the subject property at the time of enactment of the 1967 zoning resolution. Or that anything even remotely similar to the junkyard and salvaging operation that Mr. Bell has been and currently is operating on that property existed in 1967. There's like two aspects of the manifest weight of the evidence that we, if it's against the manifest weight of the evidence, that's the use of the, before the 67 ordinance and then the use after. Because both of those things were parts of the proof that had to be, and it was conflicting, wasn't it? Conflicting evidence. I submit that with respect to whether or not the uses were identical for purposes of continuing legal nonconformity. No, what I'm talking about is the evidence that got put in was conflicting for both sides. Yeah, there was some conflicting evidence, that's correct. But I think the evidence, even when looked at in a light most favorable to the appellee here, the evidence still doesn't support a finding that the activities that were going on in 1967 constitute a junkyard under that definition found in the ordinance. And then additionally, we're arguing that even if a right to such a legal nonconforming use existed when that ordinance was enacted in 1967, that that use was abandoned by the owner's voluntary and overt act of successfully petitioning to have that property rezoned subsequent to the enactment of the zoning resolution. The zoning resolution defines junkyard as any land or structure used for a salvaging operation, including, among other things, the storage and sale of waste paper, rags, scrap metal, and discarded materials, and the collecting, dismantling, storage, and salvaging of unlicensed, inoperative vehicles. No witness, not one witness who testified at the trial said that there was any business on that property in 1967 other than the soil and fertilizer business. Nowhere in the official minutes, reports, and findings made by the Board of Appeals and the Board of Supervisors in connection with the petition for rezoning, all of those documents were admitted as official public documents into evidence. Was there any mention of any type of junking or salvaging operation on the property? Any activity mentioned in any of those documents, again, is the soil and fertilizer business. The zoning board's recommendation with respect to that petition specifically indicated that the board members, in a testimony also supported that the board members actually went out to the site and conducted their own on-site inspection and making their recommendations and findings. When the Board of Supervisors adopted and approved the request for a zoning change, it made specific factual findings in its resolution, one of which was that the present use of the property in question is a fertilizer sales and service business. Nowhere in the findings does it mention anything about a salvaging or junking operation. That's the board's findings. That's the Board of Supervisors, that's correct. But there's evidence put in the trial that they continued to use it as a junkyard, though. There's also evidence that it was continued to be used as a junkyard. That it was continued to be used, I would say, not as a junkyard, but that there were inoperable vehicles from time to time. I know there was a few witnesses who testified. One testified that he had bought a windshield from a truck off of there. Somebody said he'd bought some alternators before. But again, just because there's inoperable vehicles, I submit, does not make it fall within the definition of a junkyard under the ordinance. There was no evidence that there was any type of commercial salvaging operation. There's no evidence that cars were crushed or sold for scrap metal. That Mr. Klein used the property where he purchased and dismantled used cars for usable body parts, which he stored and sold as part of a salvage operation. Simply because the impressions of a few witnesses as far as saying it was a junkyard or whatever, that doesn't mean that it falls within the definition of a junkyard. See, and that's the reason I asked the question earlier, is we're stuck with this manifest way of the evidence test. And so we're not hearing this de novo. And those are all arguments at the trial level that... I agree that with regard to whether or not the uses are identical for the purpose of not before is a manifest way of the evidence. But I would submit that when you look at the current use, as far as in addition to the admission that it falls within the definition of a junkyard, there's testimony about there being two crushers, that the current operation consists of bringing inoperable vehicles on, crushing them, putting them on a truck and hauling them out to sell them. There's no mention now of the property being used in relation to any sort of fertilizer or soil business. The only operation now is a rather extensive salvaging operation. And I would submit that the use that was in existence in 1967 is not the same use as is being used on the property today with respect to that salvaging operation. And I know I referred to the case of Village versus Aliyah where they talk about when looking at whether or not illegal non-conforming use has been continual or whether or not it has changed and lost that sense that it's the particular use and not the general classification that governs. Whereas before there was a soil and fertilizer business, again, on the property where there were some inoperable vehicles. People did go and buy some parts from time to time. Now there is an extensive salvaging operation going on with no soil or fertilizer business whatsoever. With respect to the issue of abandonment, I believe that we're arguing that any right to any sort of legal non-conforming use was abandoned when Fred Klein, who was a property owner in 1967, took the voluntary and overt act of successfully petitioning to have that property rezoned. The law is clear that abandonment of a non-conforming use forfeits the right to continue it as a legal non-conforming use. In this case, the undisputed facts are that Fred Klein, in August of 1967, petitioned to have his property rezoned from R to B2. And that that petition was approved by the Board of Supervisors in December of 1967. And that the property has remained zoned as B2 ever since. Again, this was all subsequent to enactment of the 1967 zoning resolution, which occurred in January of that year. For there to be an abandonment of a particular use, there must be evidence of involuntary conduct or an overt act by the owner, which carries the implication that the owner intended to abandon that use. Now in this case, the trial judge rejected that argument as illegal ramifications of the petition by saying that it was continued to be used as a junkyard. Well, he said that it... I'm not exactly sure from the trial court record as far as the judge's exact findings. And so I know he said that the state or the county hadn't proved its case because this existed as a legal non-conforming use. He did say he didn't know what this was before he said that, but he found that it was a legal non-conforming use. And I took issue with that in our motion to reconsider, of course, because it has to be a particular use, not just generally a non-conforming use. Well, your argument, though, basically as a matter of law, that when one petitions to have property rezoned or whatever, that manifests an intent to abandon any use that's not consistent with the zoning you're seeking. That's correct. And so our review of that issue would be the no vote. Correct, because there's no dispute as to the facts that we're relying on in relation to that argument. Those are the facts specifically dealing with the petition for a different zoning. That's correct. Looking at that in an isolated way. That's correct. I'll talk to you in a few minutes. Okay. Fred Klein abandoned any claim to acquire non-conforming use when he requested that zoning change. And then, therefore, Mr. Bell, as a successor entitled, did not acquire any non-conforming use to operate the junkyard on his property because those rights had previously been extinguished. One important case that we cite is the City of Disciplines v. LaSalle Bank of Chicago. And I think that that's a – it deals with the issue of abandonment. And in that case, the city, again, sought an action in joining the defendant from using his property for commercial purposes, which was non-conforming because the property was zoned residential. In that case, the defendants actually did file a petition for rezoning to have that property rezoned so that it would be in conformity. However, the court noted in saying, in finding that there was not an abandonment, that the petition itself for rezoning decided that the office building would remain inconstitute in non-conforming use. Here, there was no such reservation. It was simply the act of going in and asking for it to be rezoned. The other issue is that under the zoning ordinance, prior to having the property rezoned at his request, it was zoned R. Under R, there was under – after five years, any non-conforming use would have been eliminated. So here, he comes in to have it rezoned so that he can be in conformity with and continue to expand his existing fertilizer business, which again is what the public records indicate were the reason that he was asking for this rezoning classification. If it hadn't been granted, any sort of non-conforming use would have had to have been eliminated within five years under the zoning ordinance anyway. That wasn't raised at the trial level, was it, that argument, the five-year argument? Well, the issue – we're challenging that the trial court's application, interpretation of the entire zoning ordinance with respect to our claim that the defendant was in violation was incorrect. So since that was a part of the zoning ordinance, that particular section, I would say that was raised at the trial court level. By implication? By implication of the – yes, yes, sir. And we – the entire zoning ordinance was admitted into evidence, both the 1967 resolution as well as the current one with the amendments. Over time. You know, I'm trying to – you know, in understanding your argument on the post-1967 ordinance aspect, you're really trying to – are saying that because you petitioned taking that in an isolated way for this other zoning, that it stops you from claiming or putting other – because normally these things are done by the totality of all the circumstances. You look at all the evidence. What you're arguing is that that standing alone in an isolated way stops them from saying that they continue to use it in a non-conforming manner. Is that right? I would say yes. I mean, of course, this was distinguished from the City of Des Plaines case where there was a reservation within the request. But there's no – I couldn't find any case like that. I couldn't – no, I couldn't. I suppose you looked, too. I looked very thoroughly, yes. But even taking it at the totality of the circumstances, there was no indication that there was any – you look at the actual zoning application and the public meetings that were held. It all references only the existing fertilizer business, and that was the reason for the extension. There was no indication that there was any sort of understanding or agreement that this had anything to do with a salvaging operation. And I admit that if you look at those facts, perhaps it would go into a clearly erroneous standard if there's any disputed facts in that area. But my position would be that just the application itself without any reservation would be enough to constitute an abandonment. But you would agree that there wouldn't be the first court to say that? In Illinois, I believe that is correct, yes. I don't see – I don't know that a specific issue has been addressed. The closest one I could find was the Displains case. Yeah. I mean, there's no case that says the opposite either, right? That's correct. So, in conclusion, we ask, again, that you reverse the trial court and remain it with instructions that a permanent injunction be issued. Thank you. Thank you. Mr. Anderson? Thank you. May it please the court, counsel, pleased to be here in front of you today, and I appreciate the opportunity to argue the case. Sometimes, you know, you wonder in these cases whether you're in the same courtroom. And I suppose there's a reason for this manifest weight of the evidence. I wish the justices – I wish you could have seen this trial. It was really a lot of fun. You know, it was kind of scary going in and trying to figure out how you're going to prove how a property was used over 40, 45 years ago and then try to prove that it was continually used during all of that time since for the same purpose. And as many of you know who've done trial work, you know, they often kind of fall apart on you. In some cases, just turn into sand underneath your feet. In other cases where it's like a jigsaw puzzle and everything goes click, click, click and falls into place. Well, this is one of these goofy cases where it all went click, click, click. And I'm bringing in witnesses that I've never even talked to. And you never saw such a collection of absent-minded, jack-legged, hobbled-up old people walking in a courtroom talking about stuff they may not remember what they had for breakfast this morning, but they know exactly what happened when they were 7 or 8 years old or 15 or 16 years old or in their 20s. You know, I think of Charles Baker. You're not suggesting the witnesses all suffered from Alzheimer's or dementia, are you? Yeah, yeah. No, I tell you, they were pretty neat. They were pretty interesting people. But like Charles Baker talking about, you know, he's 7 years old and his dad took him out to the junkyard and taught him to shoot with a .22 rifle. And if he'd come home from school in the third or fourth grade and the rifle was gone and he was gone, his dad would know he was out there shooting rats at the junkyard with the rifle. And then he goes off to war and he's only gone from town for a four-year period. When he went off to war in what would have been the Vietnam conflict, and where'd he learn to defend his country? Probably shooting rats at the junkyard. But this guy talks about buying parts in 65, 66, 67, 1973 when he got back. And he was working in auto repair business after he got back in 73. And he got everybody from the city clerk saying when she was four years old she was taken out to this stinky junkyard and garbage pit and throwing the family. You know, this is Abingdon, Illinois. This is not somebody coming down your street with a nice clean machine and a rented truck, you know, putting your garbage away. This is people throwing it in a big smoldering pit for many years. And people who were in their 15 and 16 years old with their first cars and couldn't figure out how to get them to work. And so they would go out there and Fred Klein, or one of the guys that he would let operate on his property, would, you know, find a generator or give them a battery. And if that didn't work, they'd try to get a generator and, you know, try to figure out why it wouldn't work and get something to fit and get a car to run. Because they didn't have any money, they testified. And so they'd sell cars, they'd scrap cars. Council says there's never any indication that any of this was going on before. Well, that's all that was ever going on before. Read the transcript. That's what all the testimony is. It's the people saying they'd go out there, they'd buy sell parts, they'd sell cars, they'd strip what's good off them, and then they'd scrap what's left. And the technology may have changed a little bit in how you scrap a car. They testified that in the old days, they'd crush them with a tractor and with a hoe. And now they've got a bit of a machine and they'll wait until they get 10 or 12 cars and then they'll crush them and haul them off on a flatbed. In the meantime, they strip anything good off them and sell it. Well, it's what's always happened on this property. That's what all the witnesses have said. Every single one. There's not a single witness that ever testified that said that this operation wasn't going on from their own personal memory. Mr. Masterson was the best witness they had. This guy was the guru. This guy was the guy who came in within a couple of months of this zoning being enacted in January of 1967. And then was there with the county for 35 years or something like that. Mr. Masterson got in the stand and said he has no personal memory of this whatsoever. And all he could go by was his notes. And then he admits that his notes are not accurate. And that he has down the prior use of the property as light industrial. But then he says, well, it was a sawmill and a brickyard previously, too. And that's not light industrial. So he admits he screwed up and didn't get all the prior use of this property. And he says in his testimony that Fred Klein, the owner of the property for all these years, just wanted to be left alone to do what he did. He did a soil service with chemicals and stuff in the spring and the fall. All the rest of the time and all year round, 24-7, people would drop off junk cars, auto appliances, all this stuff. And they'd strip them off anything good and they'd scrap whatever metal was left. Terry Bell testifies to this day. He's upset with the county because they won't let him put a chain across the end of his gate because people keep dumping all sorts of stuff on his property to this day. But he's run the cleanest operation that's ever been run there. You know, what happened was in 1967, the property got annexed by Abingdon. Well, now, I don't know if that's true. But in 1967, they passed a zoning ordinance, the very first one. Now, this property had been operated this way since the 50s. And then they passed this zoning ordinance and turned this property into R1. Well, my gosh. I mean, can you imagine the ground that this is on? I mean, I was afraid to drive my car on it for getting a flat tire. We're talking, you could mine it for zinc and metal and nickel and copper and aluminum and steel and iron all day long. And not to mention the fluids and things that have been on this property. You could never build a home on it. It would not be safe for human beings. It's only fit for one purpose. That's why the city had their junkyard right next door. It is what it is. It's not in the main drag. It's a couple streets off the main drag. And it's... No. And the city's closed its dump. My client's property's been cleaned up. And, you know, the ground is full. I mean, you know, it's spring. It thaws. You know, who knows what's going to pop up out of the ground. But, I mean, there's no more stink. There's no more garbage. Now it's just purely the salvaging operation that's going on. And council says there's no evidence that it ever happened. Well, what about the scale records? You know, Klein had scale records that were intermixed in evidence. What about the VIN tags? What about the parts? What about the junking titles that we submitted into evidence? I mean... Let me just ask you though. Let me redirect it a little bit. Because what you're talking about, he said she said part and... Sure. But what about the argument that by filing a petition to rezone... Right. That that is basically without any reference to something that's inconsistent with that... Right. Is basically an abandonment of any use that... That's the scariest part of this case going into it. You know, that really was. That was the weakest part of my case. And that was the scariest part when I went in. But the case law I found, and I cited in my brief, indicates that you look at what the true... It isn't what the petition for zoning was. It's what is the true use of the property. And has the property... How is the property used at the time before it? How has it been used since? Did the use ever stop? You know, this guy... This guy wanted to build a building to expand his soil service. That's the... He didn't know his property had been zoned. Or if he did, he didn't care. He was just a junkyard and a chemical guy. And he wanted to put up his building. He went to Bob Masterson and said... And they told him he couldn't do it. Because he was residential zone. So what do I have to do to put up my building? And they told him. And he did it. But he never stopped junking cars. I mean, I can only surmise. But I would imagine he probably didn't want to really talk about... Getting a license to junk cars. Or be denied a license to run a salvage operation. He'd always been doing it. He always kept doing it. Nobody ever messed with him. Everybody in town used it. And always has. But he didn't mention it back then. He was not a sophisticated guy. Even as a sophisticated guy, he might not have mentioned it. But I don't think the use ever stopped. And I don't think just filing that petition... With the county under the existing case law... Stops him. You know? And I think counsel is dead wrong... When they come in here and say they can... Raise this issue of the... Five year amortization period for the first time on appeal. You know? That nowhere... I mean, you know, I can quote to you... From the opening arguments that they cite. Which states, you know... I'm talking to the court. Mr. Hanson's talking to the court. We're talking about what the issues are. It goes, Hanson, Anderson, Hanson, Anderson. And then it says, the real issue, as I understand it, is... As we come here... I think as counsel and I have talked... We're boiling down to, Judge... The court goes, uh-huh. Is... Has this property been a continuous non-conforming use? And the court goes, uh-huh, right. And Mr. Hanson goes... Okay, now we're on this... And I say, I think we're all on the same page here. And I say I have no objection to anything I put in a pleading. And I admitted all the zoning ordinances... All the use of the junkyard. And Mr. Hanson goes on to go, okay, now I've got something else... I want to talk about. And in his closing argument, he says the same thing he said here. The only issue is, was the junkyard a legal non-conforming use? Nowhere did he give the court an opportunity to look at that five-year statute. Nowhere did he give the court an opportunity to decide if it was reasonable. And, you know, the case law on that clearly says... That you've got to consider the length of it and the reasonableness of it. And now we've got this really interesting issue raised by the billboard cases. That, you know, we've got some appellate court findings that say that maybe amortization isn't fair. Maybe it's a taking of property when you take someone's ability and livelihood away from them over a period of years. And say, okay, you've got five years, you've got three years to use your property, and then you're done. Maybe that's a taking. What else is this property good for after 60 years as a junkyard? But that's not before us. I don't think it is before you. Because I think the issue's raised for the first time on appeal. And I think the Shell case says that you can't... All say that it's axiomatic that a question not raised in the trial court is waived and may not be raised for the first time on appeal. So I don't think you can raise that issue now. And on the taking issue, which, whether it is or isn't, is... But if you think there's a taking, it doesn't necessarily mean they can't do it. The remedy for that is to file a reverse condemnation suit and seek damages. Okay, it's only out of business. They've got to condemn it. They've got to condemn it. They've got to come take it. Well, no. It's not before you. I mean, it's not before you. And that's my point. When they say it was raised, it wasn't raised. And it hasn't been raised at any time up until when they stood here and raised it. And so, you know, and clearly this is a manifest way to the evidence case. Clearly there was conflicting evidence. You know, clearly they see the facts one way, we see the facts another way. And as such, you know, you've got to give the trial court the credit for judging the credibility of the witnesses before. And there's no doubt, you know, they try to say that the judge misapplied the standards. He was trying to be nice. He was trying to explain it in layman's terms to these people. He was trying to say that, you know, they sustained their burden of proof on a prima facie case. And we sustained our burden of proof on our affirmative defense. He was trying to be nice to most people. In reality, I admitted their case. I went in, I kept the case and the issue simple. Judge, this is just nonconforming use. You know, we admit we're a junkyard. We admit we're nonconforming. We admit we don't follow the zoning. We got approved, we were doing it before 1967 and we've done it ever since. That's our issue and counsel agreed. And we went to war and we had a fun trial and they lost on the facts. Not really on any big question of law. The question came down to the facts. And there's no doubt in the court's mind of the fact that it was a junkyard then, it's a junkyard now. It's basically the same operation. They take cars in, they strip off the good parts, they sell off the metal. I could go through all the different witnesses that testified that they did that through the years. It's not necessary. It's in the transcripts. I'm sure you guys have seen it. And a bunch of good old boys who never had much in life and worked hard, you know, trying to scratch a living out of what they could off different car parts. It's all this property's good for. It's all it's ever been good for. And frankly, Abingdon's lucky that they've got a responsible operator today that runs a neat, clean operation that doesn't have rats and doesn't have junk and debris and only deals with the metal and auto parts in the south. You know, there's a whole building full of parts for the 50s when he got it. All the records, all the VIN tags, all the junk and titles, you know, that have been admitted that he got with the building. Thank you. Thank you, Mr. Anderson. Mr. Hanson, you got some rebuttal. Yes, Your Honor. First, with respect to Mr. Masterson's testimony, I would stand on the transcript of the proceedings itself. If you take a look at those, I'm sure you'll find his testimony to be very consistent. There was no misleading. There was nothing about his testimony as far as misrepresenting stuff to the board or admitting various errors and such. I believe Mr. Masterson's testimony was not properly represented at all by counsel just now. As far as the overwhelming testimony from other witnesses, again, of the nine witnesses that they called during trial, before the witnesses even had contact with the property, at the time in 1967 or prior there, too. And again, you mentioned, you know, the buying of parts and such, and that's what they testified to. But again, you know, simply because they were buying parts, you know, they all said that there was a fertilizer, the business that was on that property was a fertilizer business. And just because one buys parts and there may be an inoperable vehicle, again, does not equate with it being a junkyard. I want to ask you something about your legal argument regarding the effect of a petition to change zoning. Okay. Had he not petitioned for rezoning, but someone else did, or the county just for whatever reason rezoned it, and whatever they rezoned it, and assuming that he was running a junkyard, it would still be a pre-existing non-conforming use, right? If it had been rezoned? Yeah, assume all those things. But I'm just saying if somebody else, or the county just went and rezoned it to B1 or whatever it was, on their own, or because of some neighbor, or whatever, it was a whole half a city being rezoned like that, the junkyard would still be a pre-existing non-conforming use, right? Right, because there wouldn't be any voluntary act there. So your argument hinges on the fact that it was he, the owner, that filed the petition. That's correct. He was the one who requested the zoning change. But as the owner, wouldn't he know that if it got rezoned, his junkyard, whatever got rezoned, his junkyard would be a pre-existing non-conforming use, assuming it met all, again, the stake argument, assuming that it met all those other qualifications. Well, again, he would know that it was going to be a pre-existing non-conforming use. Well, I know in the, again, there was no discussion or representation by him or mention of the salvaging operation whatsoever, or any... But he doesn't need the zoning authority's permission to be a pre-existing non-conforming use. This happens by operational law, doesn't it? That is correct, it does. I think when you go, you know, he wanted to be able to expand the existing fertilizer business, and he was prevented from doing so under the way it was zoned at that time. In order to be able to do what he wanted to do on that land, he had to get permission, or had to get that property rezoned. And when he took that intentional voluntary act of going to ask for that rezoning in order to allow him to be able to expand his existing fertilizer business, which wasn't allowed if he didn't go before and get that rezoned, that indicates an intent to abandon any sort of non-conforming use that existed on the property. And again, there was no reservation or anything about a salvaging operation or anything like that in this particular case. Okay, you've answered my question. You've got time? You have one minute. Okay. And finally, again, the current operation, as far as the pressures and the extent of the salvaging operation, again, in no way resembles what the evidence shows was going on in the property back in 1967. And I would submit that the use then is not the same particular use as it is being used now. And that's all I have. Thank you. Any other questions? Thank you, Mr. Hanson. Mr. Anderson, thank you, too. Per your arguments here this morning, this matter will be taken under advisement. A written disposition will be issued. Right now, the court will be on a brief recess for a panel change.